# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONNA DEITRICK, | : | CIVIL NO. 4:06-CV-1556 |
| Plaintiff | : | (Judge Brann) |
| | : | |
| v. | : | (Magistrate Judge Arbuckle) |
| | : | |
| MARK A. COSTA, ET AL. | : | |
| Defendants | : | |

## **Report and Recommendation**

[Motion for Summary Judgment - Doc. 193]

INTRODUCTION

This case is based on a series of events Plaintiff Donna Deitrick alleges she experienced at the hands of her estranged husband and his cohorts in August 2004. Late in the evening of Friday, August 13, 2004 Deitrick and a friend were engaged in an act of self help, retrieving property that she claims was hers in the divorce, from a warehouse used by her estranged husband's business. The Shamokin police responded to a burglary in progress call at the warehouse and found Deitrick loading her vehicle. Shortly thereafter her husband arrived and parked in a manner blocking her vehicle. Deitrick complains that she was then detained through the unlawful efforts of police officers Mark Costa and William Zelinski. During this detention her vehicle was impounded. Also during this detention a one-ton safe she alleges held four million dollars worth of valuables was stolen from her home. When she finally returned home she discovered the burglary and called the State

Police.  The state police investigation determined that her estranged husband had been at the home earlier in the evening at about the time her vehicle was being impounded.  The state police arrested her husband later that night for violating a protection from abuse order that prohibited him from being at her residence.

The following Monday, when Deitrick went to the Shamokin police station to retrieve her vehicle, she claims she was physically assaulted by her husband's new girlfriend, Defendant Vanessa Long and then choked by Police Chief Richard Nichols as he separated the two fighting women.  Finally, she says she was then unlawfully arrested and violently thrown into a prison cell by Officers Costa and William Miner.

Pending before the Court is a motion for summary judgment by Defendants Costa, Miner, Nichols, Searls, Zelinski, and the City of Shamokin Pennsylvania (Shamokin defendants) (Doc. 193).[1]  In their motion, the Shamokin defendants contend they are entitled to the grant of summary judgment on all of the Deitrick's claims.  For the reasons set forth below, it is recommended that the Shamokin defendants' motion for summary judgment be granted in part, and denied in part.

**PROCEDURAL HISTORY**

---

[1] Unless otherwise noted, all citations to the record are to the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

On August 11, 2006, Deitrick commenced this action by filing a complaint which alleged fourteen different causes of action against seventeen Defendants. During the pendency of this action several claims and individual Defendants were dismissed. The remaining claims against the Shamokin Defendants include both federal and state law claims.

The remaining federal claims against the Shamokin Defendants are:

> (1) Fourth Amendment claim for unlawful arrest and unlawful detention (Count I) against Moving Defendants, Costa, Miner, Nichols, and Zelinski;
>
> (2) Fourth Amendment claim for excessive force (Count I) against Defendants, Costa, Miner, Nichols, and Zelinski;
>
> (3) A Section 1983 municipality liability claims (Count II) against Moving Defendant, City of Shamokin; and,
>
> (4) A Section 1983 failure to train and supervise claim (Count III) against Moving Defendant, City of Shamokin.

The remaining state law claims against the Shamokin Defendants are:

> (1) False arrest and false imprisonment (Count IV) against Defendants Costa, Miner, Nichols, and Zelinski;
>
> (2) Assault and battery (Count V) against Defendants Costa, Miner, and Nichols;

(3) A claim of intentional infliction of emotional distress (Count VI) against Defendants Costa, Miner, Nichols, Searls, and Zelinski;

(4) A civil conspiracy claim (Count XII) against Defendants Costa,, Miner Nichols, Searls, and Zelinski;

(5) A conversion claim (Count XIII) against Defendants Costa, Miner, Nichols, Searls, and Zelinski; and,

(6) A trespass to chattels claim (Count XIV) against Defendants Costa, Miner, Nichols, Searls, and Zelinski.

The claims against the Shamokin Defendants stem from three incidents involving Deitrick, and City of Shamokin police officers. The first incident occurred on August 13, 2004, and involves a response to a reported burglary in progress at a warehouse on Carbon Street. The second incident involves a traffic stop, also on August 13, 2004, while Deitrick was fleeing from the warehouse. The third incident, an altercation between Deitrick and Defendant Vanessa Yoncuski, occurred on August 16, 2004, at the Shamokin Police Department.

On October 9, 2012, the Shamokin Defendants filed a motion for summary judgment. (Doc. 193). On December 4, 2012, Deitrick filed a response. (Doc. 228). On December 28, 2012, the Defendants filed a reply. (Doc. 252). This Motion has been fully, if belatedly, briefed, and is now ripe for review by the Court.

Motions for summary judgment are pending by others alleged to have been involved in this scheme but it was agreed during a discovery conference that the Shamokin defendant's motion would be heard first, since the claims against the other defendants are pendant to the federal jurisdiction invoked against the Shamokin defendants as state actors.

**STATEMENT OF MATERIAL FACTS.**

The following statement of the material facts is derived from the Shamokin Defendants' statement of material facts and Deitrick's responses thereto, and the underlying documents.[2] In accordance with the standard of review for a motion for summary judgment, the facts are set forth in the light most favorable to Deitrick, since she is the nonmoving party.

In August of 2004, Deitrick was separated from her now former husband, Robert Yoncuski, and resided alone in the marital residence located at 123 Miller Lane, Shamokin, Pennsylvania. (Docs. 195¶1-2; 228-1 ¶1-2). The marital residence is not within the jurisdiction of the City of Shamokin Police Department. (Doc. 195 ¶3; 228-1 ¶3).

The City of Shamokin Police Department has written policies and procedures governing the use of force by police officers. (Doc. 195 ¶5; 228-1 ¶5).

_____

[2] Deitrick's statement of material facts (Doc. 228-1) was docketed as a counter statement of undisputed material facts attached to her brief in opposition of Defendants' motion.

In August 2004 Defendants Nichols[3], Costa, Miner, and Zelinski had completed their state-required training, in addition to training in the use of force. (Docs. 195 ¶6; 228-1 ¶6). There are no disciplinary records indicating that Defendants Nichols, Costa, Miner, or Zelinski have ever been cited for the use of excessive force. (Docs. 195 ¶8; 228-1 ¶8).

Before August of 2004, Deitrick had no personal encounters with the City of Shamokin police. (Docs. 195 ¶9; 228-1 ¶9). Deitrick read about two incidents of excessive force by police in the newspaper, one recently and one in the 1980's; she does not know the identity of the police officers that were involved in these two incidents, and has not heard of any wrongdoing by the City of Shamokin police officers. (Docs. 195 ¶11; 228-1 ¶11).

Deitrick's witness, Carol Whary, had one previous encounter with the Shamokin police when she was 18 years old, which involved a minor traffic citation; she claimed the officer "gave her a hard time" but did not touch her. (Docs. 195 ¶12; 228-1 ¶12). Whary also claims that her late husband once told her that on one occasion in 1971 he was thrown down some steps by a Shamokin Police Officer when he was drunk. (Docs. 195 ¶ 13; 228-1 ¶13). Deitrick's witnesses Carol Bielski and Kenneth Deitrick have had no personal encounters with the Shamokin Police before witnessing the alleged encounter at the Shamokin

---

[3] Defendant Richard Nichols, the City of Shamokin Police Chief in 2004, is now deceased. (Doc. 195 ¶4; Doc 251).

Police Station in August 2004.  (Docs. 195 ¶17; 228-1 ¶17).  Bielski read an article in the newspaper that involved an alleged use of force by a City of Shamokin police officer, but cannot recall when she read the article or what police officer was involved.  (Docs. 195 ¶18; 228-1 ¶18).  Kenneth Deitrick has never heard of any other incidents involving City of Shamokin police officers allegedly using excessive force.  (Docs. 195 ¶20; 228-1 ¶20).  Witness Keri Balaschik has never had an encounter with a City of Shamokin police officer, and has never heard that a City of Shamokin police officer used excessive or unreasonable force against any individual.  (Docs. 195 ¶¶24, 26; 228-1 ¶¶24-26).  Defendants Jeffrey and Marianne Adams have never witnessed or heard about any incident where a City of Shamokin officer used excessive or unreasonable force.  (Docs. 195 ¶22; 228-1 ¶22).

**The August 13, 2004 Encounter at the Warehouse**

In August 2004, the Carbon Street warehouse was owned and deeded to Defendant Robert Yoncuski.  (Docs. 195 ¶28; Docs. 228-1 ¶28).  On August 13, 2004, at approximately 10:30 p.m., Defendants Costa and Zelinski were dispatched to the warehouse to investigate a burglary in progress.  (Docs. 195¶ ¶29, 31; 228-1 ¶¶29, 31).

Upon arriving at the warehouse, Defendants Costa and Zelinski observed a large "U-Haul" type van backed up to a garage; the van was being loaded by an

adult female later identified as Donna Deitrick. (Docs. 195 ¶30; 228-1 ¶30). Defendant Costa approached Dennis Moore, who was standing across the street, while Defendant Zelinski approached Deitrick. (Docs. 195 ¶¶31-32; 228-1 ¶¶31-32).

At Defendant Zelinski's approach, Deitrick identified herself. (Docs. 195 31; 228-1 ¶31). Defendant Zelinski informed Deitrick that he was responding to a reported burglary-in-progress at the warehouse. (Docs. 195 ¶33; 228-1 ¶33). Deitrick replied that the warehouse belonged to her husband, Defendant Robert Yoncuski. *Id.*

At some point, Defendant Robert Yoncuski, driving a pickup truck, arrived at the scene. (Docs. 195 ¶34). Defendant Robert Yoncuski parked his truck directly in front of the van driven by Deitrick, and approached Defendant Costa, who was still standing across the street from the warehouse. *Id.* Defendant Robert Yoncuski informed Defendant Costa that he owned the van, and that it lacked insurance coverage.[4] (Doc. 195 ¶34).

---

[4] Deitrick objects to the veracity of Defendant Robert Yoncuski's representation to Defendant Costa, and claims that Defendant Yoncuski's statements are suspect based on a subsequent perjury conviction. The representation made by Defendant Robert Yoncuski to Defendant Costa is supported by Defendant Costa's affidavit, and while there is a doubt as to the veracity of the statement itself, Deitrick has failed to point to any evidence in the record which refutes the fact that Defendant Robert Yoncuski told Defendant Costa that the van was uninsured. *See* Doc. 228-1 ¶34.

Deitrick finished loading the van, and then moved Defendant Robert Yoncuski's pickup truck to allow the van ample room to leave the warehouse. (Docs. 195 ¶37; 228-1 ¶37).  Defendant Costa commanded Deitrick to return to warehouse, instead of obeying, Deitrick left the warehouse heading south on Carbon Street.  (Docs. 195 ¶¶37-39; 228-1 ¶¶37-39).

Neither Defendant Costa nor Defendant Zelinski made any physical contact with Deitrick at the warehouse.  (Docs. 195 ¶40; 228-1 ¶40).  Defendants Costa and Zelinski did not leave Deitrick alone with Defendant Robert Yoncuski at any time while at the warehouse.  (Docs. 195 ¶42; 228-1¶42).  Defendant Robert Yoncuski made no physical contact with Deitrick on the night of August 13, 2004. *Id.*

Defendants Miner and Searls were not within sight or hearing distance of the Carbon Street warehouse when the events occurred.  (Docs. 195 ¶46; 228-1¶46).

**The August 13, 2004 Traffic Stop**

After leaving the Carbon street warehouse, Deitrick was pursued in a marked police vehicle driven by Defendant Costa with lights and sirens activated. (Docs. 195 ¶47; 228-1 ¶47).  After being followed for several blocks, Deitrick pulled over in the 300 block of West Third Street.  (Docs. 195 ¶48; 228-1 ¶47).

Defendant Costa approached Deitrick, and immediately asked her to exit the vehicle, she refused to leave the vehicle for approximately 30-40 minutes.  (Docs.

195 ¶49; 228-1 ¶49).  She did not exit the vehicle until Defendant Costa reached in, and took the keys out of the van's ignition.  (Docs. 195 ¶58; 228-1 ¶58).

Defendant Searls, an off-duty Shamokin Police Officer, observing police lights outside his residence, walked over to the area where Defendant Costa had pulled over Deitrick.  (Docs. 195 ¶54; 228-1 ¶54).  Defendant Searls assisted Defendant Costa by directing traffic around the police cruiser and stopped vehicle.  (Docs. 195 ¶55; 228-1 ¶55).

At some point Defendant Robert Yoncuski, arrived at the location of the traffic stop and stood across the street.  (Docs. 195 ¶ 50; 228-1 ¶50).  Officer Costa spoke with both Deitrick and Defendant Robert Yoncuski while at the scene.  (Docs. 195 ¶51; 228-1 ¶51).   He advised both parties that no theft had taken place, and that their marital property dispute was a civil matter.  *Id*.

The cube van driven by Deitrick was owned by ARC Inc.  (Docs. 195 ¶ 60; 228-1 ¶60).  At that time, Defendant Robert Yoncuski was the principle in ARC, Inc.  (Docs. 195 ¶36; 228-1 ¶36).  During the course of the traffic stop, Defendant Costa told Deitrick that there was no liability insurance on the van.  (Docs. 195 ¶ 64; 228-1 ¶64).  Once she exited the van, Defendant Costa recommended Deitrick and her friend call for a ride home.  (Docs. 195 ¶64; 228-1 ¶64).  The van was driven to the Shamokin Police Department to be impounded until the parties could resolve the matter.  (Doc. 195 ¶52; 228-1 ¶52).

Defendant Miner was not within sight or hearing distance of the traffic stop when it occurred.  (Docs. 195 ¶67; 228-1 ¶67).

**The August 16, 2004 Police Station Incident**

On the morning of August 16, 2004, Defendants Robert Yoncuski and Vanessa Yoncuski[5] were at the Shamokin Police Station.  (Docs. 195 ¶82; 228-1 ¶82).  Defendant Costa spoke to Defendant Robert Yoncuski in an interview room while Defendant Vanessa Yoncuski waited in the lobby.  *Id.*  The lobby and the interview room are separated by one-way glass, such that the lobby is visible to those in the interview room.  *Id.*

Deitrick, and her brother Kenneth Deitrick arrived at the Police station while Defendants Costa and Robert Yoncuski were in the interview room.  (Docs. 195 ¶84; 228-1 ¶84).  Deitrick and her brother were in the lobby.  *Id.*  Still in the interview room, Defendant Costa looked into the lobby through the one-way glass window and discovered that Deitrick and Defendant Vanessa Yoncuski were involved in a physical altercation.  (Docs. 195 ¶85; 228-1 ¶85).  Defendant Robert Yoncuski quickly left the interview room followed by Defendants Costa and Nichols.  (Docs. 195 ¶86; 228-1 ¶86).  Then, Defendant Robert Yoncuski tacked Kenneth Deitrick.  (Docs. 195 ¶87; 228-1 ¶87).  Officer Costa separated Defendant

---

[5] During the pendency of this action Defendants Robert Yoncuski and Vanessa Long married. Her name was legally changed to Vanessa Yoncuski, but in some portions of the record she is referred to by her former married name of Kleman.

Robert Yoncuski and Kenneth Deitrick, taking the former back to the interview room.  (Docs. 195 ¶88; 228-1 ¶88).

Defendant Nichols attempted to separate Deitrick and Defendant Vanessa Yoncuski by verbally commanding both women to stop.  (Docs. 195 ¶90; 228-1 ¶90).  Despite Defendant Nichols' command, the altercation continued.  (Docs. 195 ¶92; 228-1 ¶92).  Ultimately, Defendant Nichols employed a form of physical restraint he described as a neck block, and Deitrick refers to as a choke hold.  (Docs. 195 ¶93; 228-1 ¶93).  Deitrick was still engaged in a fight with Defendant Vanessa Yoncuski when Defendant Nichols applied a "choke hold."  (Docs. 195 ¶94; 228-1 ¶94).  Once the women were separated, Defendants Vanessa and Robert Yoncuski were removed to the interview room where they were cited for disorderly conduct, and Deitrick instructed to remain seated in the lobby.  (Docs. 195 ¶¶95-96; 228-1 ¶¶95-96).

Deitrick was charged with disorderly conduct, harassment, and resisting arrest in connection with the altercation with Defendant Vanessa Yoncuski.  (Doc. 195 ¶106-107; 228-1 ¶¶106-107).  Deitrick pleaded guilty to disorderly conduct and harassment, the charge of resisting arrest was nolle prossed in consideration of her guilty plea.  (Doc. 195 ¶106; 228-1 ¶106).

**The removal of the Safe from Plaintiff's Residence on August 13, 2004**

The only individuals present at Deitrick's residence when the safe was removed on August 13, 2004, were Robert Yoncuski, Jeffrey Adams, Marianne Adams, Troy Latshaw, and Kyle Schaffler. (Docs. 195 ¶68; 228-1 ¶68). There were no City of Shamokin police officers in the vicinity of Deitrick's residence when the safe was removed, or in the vicinity of Adams' residence where the safe was taken after its removal. (Docs. 195 ¶¶69-70; 228-1¶¶69-70). The Adams' residence is not located within the City of Shamokin. (Docs. 195 ¶71; 228-1 ¶71).

Deitrick never saw Defendant Robert Yoncuski socialize with Defendants Costa, Miner, Nichols, Zelinski, or Searls. (Docs. 195 ¶74; 228-1 ¶74). Deitrick admitted at her deposition that she has no evidence to establish that the City of Shamokin police officers purposefully held her at the traffic stop on August 13, 2004, in furtherance of a conspiracy to remove her safe, and that no one ever told her that was the case. (Doc. 195 ¶79, 81).

Deitrick's witnesses have no proof beyond mere speculation that the individual police officers named as Defendants, Officer Mark Costa, Officer William Miner, Chief Richard Nichols, Officer William Zelinski and Officer Robert Searls, or any other police officer or employee of the City of Shamokin knew the whereabouts of the safe or the contents of the safe at any time or was involved in the planning or execution of its removal. (Doc. 195 ¶75-77; 228-1 ¶75-77).

## SUMMARY JUDGMENT STANDARD

The Defendants have moved for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011)(quoting Fed.R.Civ.P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met this burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed.R.Civ.P. 56(c). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, *supra*, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson, supra,* 477 U.S. at 248. A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for

the non-moving party. *Id.* at 248-49. When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011)[quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)].

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson, supra,* 477 U.S. at 249. The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex, supra*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra*, 477 U.S. at 323). "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving

party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

## DISCUSSION

### I. Federal Causes of Action

Deitrick alleges the following §1983 claims against the Shamokin Defendants:

A) Fourth Amendment claims of unlawful detention and unlawful arrest;

B) Fourth Amendment claims of use of excessive force; and,

C) Miner claims of municipal liability against the City of Shamokin.

In their brief in support of the motion for summary judgment, the Shamokin Defendants raise the issue of qualified immunity. The doctrine of qualified immunity provides that, despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). Qualified immunity operates to ensure that, before they are subjected to suit, officers are on notice that their conduct is unlawful. *Id.*

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the Defendant violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001), abrogated in part by *Pearson . Callahan*, 555 U.S. 223 (2009); *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007); *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006). If the Defendant did not actually commit a constitutional violation, then the court must find in the Defendant's favor. *Saucier*, 533 U.S. at 201. If the Defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the Defendant acted. *Pearson*, 555 U.S. at 232; *Saucier*, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. *Williams*, 455 F.3d at 191 (citing *Saucier*, 533 U.S. at 202).

When qualified immunity is raised at the summary judgment stage, the Court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for the purposes of qualified immunity. *See Gruenke v. Seip,* 225 F.3d 290, 299–300 (3d Cir.2000); *Crouse v. S. Lebanon Twp.,* 668 F.Supp.2d 664,

671(M.D.Pa. 2009) (Conner, J.); *see also Grant v. City of Pittsburgh,* 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish.... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).")

Proceeding under this framework, the Court will examine Deitrick's § 1983 claims of Fourth Amendment unlawful imprisonment, Fourth Amendment unlawful arrest, and Fourth Amendment use of excessive force to determine whether the Shamokin Defendants are entitled to qualified immunity, and whether summary judgment is warranted.

## A. 42 U.S.C. §1983 Claims of Unlawful Arrest, and Unlawful Imprisonment.

Deitrick alleges that Defendants Costa, Miner, Nichols, and Zelinski subjected her to unlawful imprisonment and arrest in violation of her Fourth Amendment rights. In their motion, the Shamokin Defendants argue that they are entitled to qualified immunity, and the grant of summary judgment with respect to Deitrick's Fourth Amendment claims of unlawful arrest and unlawful detention. The analysis of a Fourth Amendment claim boils down to two questions: "Was there in fact a seizure? If so, was that seizure reasonable?" *United States v. Smith*, 575 F.3d 308, 313 (3d Cir. 2009).

In the action *sub judice*, Deitrick argues that there are three acts by the Shamokin Defendants that constitute unlawful detention or unlawful arrest in violation of her Fourth Amendment rights. The first occurred on August 13, 2004, at the warehouse, where she alleges she was falsely imprisoned by Defendants Costa, Zelinski. The second occurred a few minutes later during the August 13, 2004 traffic stop, where she alleges she was falsely imprisoned by Defendants Costa and Zelinski. The third occurred on August 16, 2004, where she alleges that she was falsely arrested by Defendants Costa, Miner, Nichols, and Zelinski.

A claim under §1983 for unlawful arrest or unlawful imprisonment is grounded in the Fourth Amendment guarantee against unreasonable search and seizures. *Garcia v. County of Bucks*, 155 F.Supp 2d 259, 265 (E.D.Pa. 2001) (*citing Groman v. Twp. Of Manalapan*, 47 F.3d 628, 636 (3d. Cir. 1995)). The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of "reasonableness." Reasonableness under the Fourth Amendment is a flexible standard, *Bodine v. Warwick*, 72 F.3d 393, 398 (3d Cir. 1995), not capable of precise definition or mechanical application, *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Id.* Implemented in this manner, the reasonableness standard usually requires, at a minimum that the facts upon which an intrusion is based be capable of measurement against "an

objective standard," whether this be probable cause or a less stringent test. *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)(footnotes omitted).


**The August 13, 2004 Warehouse Incident**

In her complaint, Deitrick alleges violations of her Fourth Amendment rights based on an unlawful seizure of her person on August 13, 2004, at the Carbon Street warehouse. In their motion, the Shamokin Defendants respond that to the extent that any seizure occurred at the warehouse, it was based on probable cause.

An inquiry into an alleged seizure must begin by determining when the seizure occurred. A person has been seized, within the meaning of the Fourth Amendment, "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Menderhall*, 446 U.S. 544, 554 (1980). Law enforcement officers do not violate the Fourth Amendment "merely by approaching individuals on the street or in public places," putting questions to those "willing to listen," and "ask[ing] for identification" even absent any "basis for suspecting a particular individual." *United States v. Drayton*, 536 U.S. 194, 200, 201 (2002). Rather, Fourth Amendment protections are triggered when an encounter loses its consensual nature. A Fourth Amendment seizure has occurred if any individual is restrained by an officer's use of "physical force or show of authority." *United States v.*

*Smith*, 575 F.3d at 312.  In determining whether a Fourth Amendment seizure occurred Courts have looked at a variety of factors indicative of a seizure: "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *Id.* at 313 (quoting *Menderhall*, 446 U.S. at 554).

Defendants Costa and Zelinski made no "show of authority" at the Carbon Street warehouse triggering Deitrick's Fourth Amendment rights until she attempted to flee the property, at which point Officer Costa banged on her window and commanded her to return to the warehouse.  No actual seizure occurred at this point, however, because Deitrick ignored Defendant Costa's command and fled the scene.  *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that a show of authority by police which is ignored by a fleeing subject does not constitute a seizure).

Therefore, because Deitrick was not "seized" at the Carbon Street warehouse, there has been no violation of her constitutional rights, thus it is recommended that Defendants Costa, Miner, Nichols, and Zelinski are entitled qualified immunity with respect to this claim.  Furthermore, it is recommended that the Defendants are entitled to the grant of summary judgment with respect to

Deitrick's §1983 claim of unlawful detention at the warehouse because she has failed to establish that she was detained there.

**The August 13, 2004, Traffic Stop**

In her complaint, Deitrick alleges that she was unlawfully detained by Defendants Costa and Zelinski during a traffic stop on August 13, 2004. In their motion, the Shamokin Defendants respond that their purpose in initiating a traffic stop was to prevent the operation of a vehicle that they had probable cause to believe was not covered by liability insurance as required by Pennsylvania law; they assert that Deitrick was not "seized", and was free to leave at any time, without her vehicle. It is settled law, however, that a traffic stop itself is a seizure of every person in the stopped vehicle. *See Prouse*, 440 U.S. at 653. Therefore, Deitrick was "seized" for Fourth Amendment purposes from the moment her van was pulled over.

"[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (*citing Terry v. Ohio*, 391 U.S. 1, 30 (1968). To be consistent with the Fourth Amendment, however, an officer need only have reasonable, articulable suspicion

that a vehicle has committed criminal activity to make a stop. *United States v. Delfin-Colina,* 464 F.3d 392, 396 (3d Cir. 2006). Any "technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." *U.S. v. Mosley,* 454 F.3d 249, 252 (3d Cir. 2006). The standard of reasonable suspicion requires only a "minimal level of objective justification," *Delfin-Colina,* 464 F.3d at 396, when looking at the totality of the circumstances as they were available to the officer prior to the stop. *United States v. Goodrich,* 450 F.3d 552, 559 (3d Cir.2006) ("In evaluating whether there was an objective basis for reasonable suspicion, we consider the totality of the circumstances-the whole picture.") (internal citations omitted). Much deference should be given to an officer's knowledge "of the nature and nuances of the type of criminal activity" in determining whether the reasonable suspicion standard has been met. *United States v. Givan,* 320 F.3d 452, 458 (3d Cir. 2003).

While at the Carbon Street warehouse, Defendant Costa was informed by Defendant Robert Yoncuski the van driven by Deitrick lacked liability insurance. Therefore, Defendants Costa and Zelinski, initiated a traffic stop acting upon a reasonable suspicion that the van was being operated without liability insurance in violation of 75 Pa. Cons. Stat. §1786. Once Deitrick exited the vehicle, she was instructed to call for a ride home, thus ending the seizure of Deitrick's person.

Therefore, because Deitrick fails to establish that her constitutional rights were violated it is recommended that the Defendants are entitled qualified immunity. Furthermore, it is recommended that the Shamokin Defendants' are entitled to summary judgment with respect Deitrick's §1983 claim of unlawful imprisonment because she has failed to establish that the traffic stop was initiated without reasonable suspicion.

**The August 16, 2004 Altercation at the Shamokin Police Station**

To maintain a claim of false arrest, a plaintiff must "show that the arresting officer lacked probable cause to make the arrest." *Groman*, 47 F.3d at 636. Probable cause exists when the facts and circumstances within an officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested. *Id.* The analysis of an unlawful arrest claim looks, not to the guilt or innocence of the accused, but rather focuses solely on the existence of probable cause at the time of the arrest. A false arrest claim fails if there was probable cause to arrest for at least one of the offenses involved. *Johnson v. Knorr*, 477 F.3d 75 (3d. Cir. 2007).

The Shamokin Defendants assert that Deitrick's claim of unlawful arrest with respect to the August 16, 2004, altercation at the Shamokin Police Department fails because her guilty plea to the criminal charges of disorderly conduct, and harassment have the legal effect of establishing probable cause

existed at the time of the arrest. (Doc. 194 at 31-32). In *Heck v. Humphrey*, the Supreme Court held a plaintiff may not recover damages under §1983 for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" unless the plaintiff "prove[s] that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck v. Humphrey,* 512 U.S. 477, 487 (1994).

Deitrick responds that pleading guilty to the underlying summary offenses of harassment and disorderly conduct does not trigger the *Heck* doctrine. (Doc. 228 at 23). Deitrick argues that the conviction of relatively minor crimes, i.e. harassment or disorderly conduct, is frequently due to expediency rather than guilt, therefore Deitrick's conviction for the summary offenses underlying her arrest do not have the legal result of establishing probable cause for her arrest. *Id.*

In dealing with the question of whether entering guilty plea to a summary offense runs afoul of the *Heck* doctrine, the Court has held that pleading guilty to a summary offense does invalidate §1983 claims of false arrest. *Kokinda v. Breiner*, 557 F. Supp. 2d 581, 593 (M.D.Pa. 2008) (Caputo, J.) (finding that a plaintiff's guilty plea to the state law charge of harassment, and his concession that the underlying arrest was based on probable cause invalidated his claim of false arrest

under §1983); *see also, Piazza v. Lakkis,* No. 3:11-CV-2130, 2012 WL 2007112 *6 (M.D.Pa. June 5, 2012) (finding that a §1983 claim of unlawful arrest is invalidated by an underlying conviction of a summary offense). Deitrick's claim is *Heck*-barred because the state court records clearly show that Deitrick pleaded guilty to the charges of harassment and disorderly conduct, and there is no indication that it has been reversed, expunged, or otherwise invalidated.

Therefore, because Deitrick fails to establish that her constitutional rights were violated it is recommended that the Defendants are entitled qualified immunity with respect Deitrick's §1983 claim of unlawful arrest. Furthermore, it is recommended that the Shamokin Defendants are entitled to the grant of summary judgment with respect to Deitrick's claim of unlawful arrest stemming from the August 16, 2004 altercation, because there was probable cause for at least one offense underlying Deitrick's arrest.

### B. 42 U.S.C. §1983 claim of Excessive Force

In her complaint, Deitrick alleges that Defendants Costa, Miner, Nichols, and Zelinski used excessive force in violation of her Fourth Amendment rights. In their motion, the Defendants argue that they are entitled to qualified immunity, and the grant of summary judgment because none of the Shamokin Defendants used excessive force.

A law enforcement officer's use of excessive force in the course of an arrest or investigatory stop constitutes an unlawful "seizure" under the Fourth Amendment. *Graham v. Conner,* 490 U.S. 386, 394 (1989); *Carswell v. Borough of Homestead,* 381 F.3d 235, 240 (3d Cir.2004). To determine whether specific conduct qualifies as excessive force, the court must examine its objective "reasonableness." *Graham,* 490 U.S. at 395–96.

The Court's Fourth Amendment jurisprudence has recognized that incumbent to the right to arrest is the right to use some degree of force, or threat thereof, to affect the arrest. *Graham,* 490 U.S. at 396. The Court established a non-exhaustive list of factors which should be considered when determining the reasonableness of a particular use of force by an officer under the facts and circumstances in a specific case. *Id.* The court should consider the severity of the crime, the suspect's "immediate threat" to the safety of officers or others, resistance to arrest, attempts to flee, and access to weapons. *Id*; *Couden v. Duffy,* 446 F.3d 483, 497 (3d Cir. 2006). The court should also consider the duration of the law enforcement officer's use of force, whether the officer was attempting to effect an arrest, and the presence of accomplices. *Sharrar v. Felsin,* 128 F.3d 810, 822 (3d Cir.1997) (*abrogated on other grounds by Curley v. Klem,* 499 F.3d 199 (3d Cir.2007)). The court must examine the use of force from "the perspective of a

reasonable officer on the scene," without the benefit of hindsight. *Graham,* 490 U.S. at 396.

Deitrick admits that Defendants Costa, Zelinski and Searls did not harm or have any physical contact with her on August 13, 2004. Accordingly, the incident at the Shamokin Police Station on August 16, 2004, is the only incident that would be relevant to any excessive force claim. There were at two acts committed during the course of Deitrick's arrest that she alleges constitute excessive force: first, Defendant Nichols used a "choke hold" to separate Deitrick from Defendant Vanessa Yoncuski while the women were engaged in a physical altercation; and, second Deitrick was "dragged" to a holding cell by officers Costa and Miner.

**Defendant Nichols Use of Force**

With respect to the allegations that Chief Nichols used excessive force when separating Deitrick and Defendant Vanessa Yoncuski, there is no genuine issue of material fact. The record reflects that when police officers entered the lobby, Deitrick and Defendant Vanessa Yoncuski did not halt the altercation. Deitrick agrees that she heard at least one verbal warning to halt the altercation; she alleges that at this point she attempted to halt the altercation but her hands became tangled in Defendant Vanessa Yoncuski's hair. Defendant Nichols, interpreting the continuing physical contact between Deitrick and Defendant Vanessa Yoncuski as a failure to heed his command escalated level of force to "open hand" control and

utilized a "neck block" or "choke hold" on Deitrick for approximately one to two seconds in order to separate the two women. In light of Deitrick's and Defendant Vanessa Yoncuski's failure to halt their altercation after hearing verbal commands, the potential for other parties to escalate the altercation[6], and the short duration of the actual application of force, Defendant Nichols use of force was objectively reasonable given the circumstances.

Therefore, because Deitrick fails to establish that her constitutional rights were violated it is recommended that the Defendant Nichols is entitled qualified immunity with respect to this claim. Furthermore, viewing these facts in from the prospective of a reasonable officer at the scene, the Court must conclude that Defendant Nichols' use of force was objectively reasonable, thus it is recommended that Defendant Nichols is entitled to the grant of summary judgment with respect to Deitrick's §1983 excessive force claim.

**Defendants Miner and Costa Use of Force**

With respect to the allegations that officers Miner and Costa used excessive force when placing Deitrick into the lock-up, there is a genuine issue of material fact as to whether she was making any attempt to resist arrest. Deitrick alleges that she was having difficulty breathing following the altercation with Defendant

---

[6] Kenneth Deitrick and Defendant Robert Yoncuski engaged in a similar physical altercation at the Shamokin Police station while Deitrick and Defendant Vanessa Yoncuski were fighting.

Vanessa Yoncuski. She alleges that she turned to her brother, and told him she was in need of medical attention when she was placed under arrest and, not resisting, was dragged to a holding cell by Defendants Miner and Costa. Deitrick's recitation of the events is corroborated by two witnesses; her brother, Ken Deitrick; and her friend, Carole Bielski. In contrast, the police officers present at the scene allege that Deitrick became increasingly agitated when informed that she would be cited for disorderly conduct, and actively resisted the Defendant police officers' verbal commands when they attempted to escort her into another room.

Therefore, because Deitrick has established a viable constitutional claim, Defendants Costa and Miner are not entitled to qualified immunity unless the law prohibiting the use of excessive force by police was not clearly established in the context of this action. The United States Supreme Court decided *Graham* in 1989, and the Third Circuit issued its opinion in *Sharrar* in 1997. Therefore, we find the law prohibiting excessive force by police officers making an arrest was clearly-established at the time of this incident on August 16, 2004. It is recommended that Defendants Costa and Miner are not entitled to qualified immunity with respect to Deitrick's §1983 excessive force claims.

Viewing the disputed facts in the light most favorable to Deitrick, the Court cannot conclude as a matter of law that Defendants' use of force was objectively reasonable, thus it is also recommended that the grant of summary judgment with

respect to Deitrick's §1983 excessive force claims against Defendants Miner and Costa is inappropriate.

**Defendant Zelinski - Use of Force**

With respect to the allegation that officer Zelinski used excessive force, the record reflects that no officer had physical contact with Deitrick on August 13, 2004. Furthermore, on August 16, 2004, when there was a use of force, there is nothing on the record indicating that Defendant Zelinski was present. Therefore, because Deitrick fails to establish that her constitutional rights were violated by officer Zelinski with respect to her §1983 excessive force claim, it is recommended that the officer Zelinski is entitled qualified immunity with respect to this claim. Furthermore, because there is no record evidence that he had any physical contact with Deitrick, it is recommended that officer Zelinski is entitled to the grant of summary judgment with respect to Deitrick's §1983 excessive force claim.

## C. Municipal Liability.

In the instant action, Deitrick alleges two claims against the City of Shamokin. First, Deitrick sets forth a §1983 claim alleging that the City of Shamokin is liable under §1983 because it had a policy, practice, or custom of allowing police to use excessive force. Second, Deitrick alleges a §1983 claim against the City of Shamokin predicated on a failure to train its police in the

appropriate use of excessive force. The Defendants argue that they are entitled to summary judgment because Deitrick has failed to identify any specific policy which amounts to deliberate indifference, and because there is no record evidence that Defendants' were improperly trained in the use of force.

For municipal liability to attach to the City of Shamokin, Deitrick must allege that the City itself caused a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In order to establish her claim, Deitrick must plead, and prove that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury." *Bd. of the Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)(*emphasis in original*). To do so, a plaintiff must allege that a municipal custom or policy was the proximate cause of the constitutional injury sustained. *C.N. v. Ridgewood Br. of Educ.*, 430 F.3d 159, 173 (3d Cir. 1990). To establish that a municipality has a custom that violates §1983, a plaintiff must identify a custom or practice "so permanent and well-settled as to virtually constitute law." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d. Cir. 1996). To establish that a municipality has a policy that violates §1983, a plaintiff must show that a "decisionmaker possessing final authority to establish municipal policy with respect to the action 'issues an official proclamation, policy or edict.'" *Id.* Courts have held that "a plaintiff must identify a municipal policy or custom

that amounts to deliberate indifference of the rights of people with whom the police come into contact." *Carswell*, 381 F.3d at 244.

Neither Deitrick herself, nor any of her witnesses have any first-hand knowledge of any other incidents where excessive force was used by a City of Shamokin police officer, and there is no other evidence on the record that there is a custom or practice of doing so. Furthermore, Deitrick has not identified a particular policy or custom that amounts to deliberate indifference of the rights of people with whom the police come into contact. The record evidence associated with the Shamokin Police Department's use of force policy includes: an affidavit by Police Chief Edward Griffiths (Doc. 196-2), indicating that the City of Shamokin had a written policy governing the use of force by police officers in 2004, and that Defendants Nichols, Costa, Miner, and Zelinski were in compliance with state mandated training in the use of force; and, an exhibit labeled "Shamokin Police Department Use of Force Policy."

Deitrick asserts that this written policy (Doc. 196-3) is not genuine. This assertion does little to advance her claims, as she has put forth no record evidence to rebut Police Chief Griffith's affidavit that there was a use of force policy in August 2004. In the alternative, Deitrick argues that even where the docketed policy is genuine, it pertains only to the use of weapons and that the lack of any policy regarding "empty hand" or weaponless force amounts to deliberate

indifference. This argument also fails, as an examination of the policy reveals that it contains a clearly defined procedure for the escalation of physical force utilized by police officers called "Level of Force Contingency" which recommends that empty hand force be applied after both the physical presence of an officer, and verbal commands fail to deter prohibited behavior. (*See* Doc. 196-3 at 3).

Additionally, Deitrick argues that the Defendant City of Shamokin is liable under §1983 for the failure to adequately train its officers in the use of excessive force. *See City of Canton Ohio v. Harris*, 489 U.S. 378 (1989) (holding that the inadequacy of police training may serve as a basis for municipal liability where that failure to train amounts to deliberate indifference to rights of the persons with whom the police come into contact). Current Police Chief Griffith included in his affidavit (Doc. 196-2) assertions that in August 2004, officers Nichols, Costa, Miner, and Zelinski were in compliance with all state required training in the use of force. Deitrick has offered no record evidence to rebut Griffiths' affidavit.

For the foregoing reasons, it is recommended that the Defendant City of Shamokin is entitled to the grant of summary judgment with respect to Deitrick's claims of municipal liability.

## II. State Law Claims

Deitrick advances several state-law claims against Defendants Costa, Miner, Nichols, Sealrs and Zelinski. She seeks recovery for: false arrest and imprisonment

against Defendants Costa, Miner, Nichols, and Zelinski; assault and battery against Defendants Costa, Miner, and Nichols; intentional infliction of emotional distress against Defendants Costa, Miner, Nichols, and Zelinski; and civil conspiracy against Defendants Costa, Miner, Nichols, and Zelinski. As the Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a), the Court will consider the pendant state law claims.

### A. False Imprisonment/False Arrest (Count IV)

Deitrick alleges state-law claims of false imprisonment and false arrest against Defendants Costa, Miner, Nichols, Searls, and Zelinski. The Defendants respond that they are entitled to the grant of summary judgment because Detrick's arrest was supported by probable cause.

"[F]alse arrest and false imprisonment are essentially the same claim." *Olender v. Twp. of Bensalem,* 32 F.Supp.2d 775, 791 (E.D.Pa.1999). There are two elements to a claim of false imprisonment under Pennsylvania law: "(1) the detention of another person, and (2) the unlawfulness of such detention." *Renk v. City of Pittsburgh,* 641 A.2d 289, 293 (Pa. 1994). Deitrick alleges that the Shamokin Defendants lack the requisite standard of objective reasonableness to detain her on August 13, 2004, and to arrest her on August 16, 2004.

"In Pennsylvania, a false arrest is defined as 1) an arrest made without probable cause or 2) an arrest made by a person without privilege to do so,"

*Russoli v. Salisbury Twp.,* 126 F.Supp.2d 821, 869 (E.D.Pa. 2000), the cases involving false arrest claims against police officers turn on the existence or nonexistence of probable cause.   The same basic reasoning applies to the state-law claims of false arrest and false imprisonment, these claims are essentially treated as the same cause of action.   *Pellegrino v. United States Transp. Sec. Admin.*, No. 09-CV-5505, 2012 WL 661773 (E.D.Pa. Feb. 28, 2012). "Pennsylvania state law false arrest claims and federal constitutional false arrest claims are co-extensive as to both elements of proof and elements of damages." *Russoli v. Salisbury Twp.,* 126 F.Supp.2d 821, 869 (E.D.Pa. 2000).  Deitrick has cited no authority suggesting that federal and state law out not be co-extensive in the factual situation presented, therefore, it is recommended that the Shamokin Defendants are entitled to the grant of summary judgment with respect to Deitrick's state-law claims of false arrest and false imprisonment.

### B. Assault and Battery (Count V)

Deitrick alleges state-law claims of assault and battery against Defendants Costa, Miner, and Nichols.  The Defendants argue that they are entitled to the grant of summary judgment because their use of force was reasonable under the circumstances, and therefore cannot constitute an assault and battery.

Generally, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and battery is committed whenever the violence menaced in an

assault is actually done, though in ever so small a degree, upon the person." *Renk*, 641 A.2d at 293 (Pa. 1994)(*citing Cohen v. Lit Bros.*, 70 A.2d 419, 421(Pa. Super. Ct. 1950)).

**Assault Claims:**

To succeed on an assault claim in Pennsylvania, a plaintiff must show that the defendant "intentionally caused an imminent apprehension of a harmful or offensive bodily contact in [p]laintiff." *Lakits v. York,* 258 F.Supp.2d 401, 407 (E.D.Pa.2003) (citing *Sides v. Cleland,* 648 A.2d 793, 796 (Pa.Super.1994); Restatement (Second) of Torts § 21)). The plaintiff must actually be put in a state of immediate apprehension. *See* Restatement (Second) of Torts § 21.

There is no evidence on the record which indicates that Defendants Nichols, Costa, Miner, or Zelinski caused an imminent apprehension of a harmful or offensive bodily contact in Deitrick. Therefore, it is recommended that Defendants' are entitled to the grant of summary judgment with respect to Deitrick's state law assault claims.

**Battery Claims:**

To support a claim for the intentional tort of battery in Pennsylvania, a plaintiff must show that: (1) the defendant "[acted] intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (2) an offensive contact with the person of the

other directly or indirectly results." Restatement (Second) of Torts § 18. Some physical contact between the defendant and the plaintiff must occur, or a plaintiff's battery claim fails. *Id.*

In *Renk v. City of Pittsburgh*, a case involving an allegation of assault and battery by a police officer, the Supreme Court of Pennsylvania explained that:

> A police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty... [t]he reasonableness of the force used in making… determines whether the police officer's conduct constitutes an assault and battery.

*Renk,* 641 A.2d at 293 (Pa.1994).

As previously discussed in the context of Deitrick's Fourth Amendment claims, Defendant Nichols' utilization of a "neck block" or "choke hold" was objectively reasonable use of force performed during the course of his duties. Therefore, it is recommended that Defendant Nichols' is entitled to the grant of summary judgment with respect to Deitrick's state law battery claims.

With respect to Detirck's battery claim against Defendants Costa and Miner, there is a genuine issue of material fact that their conduct in dragging Deitrick was reasonable under the circumstances. Therefore, it is recommended that the grant of summary judgment with respect to Detrick's battery claims against Defendants Costa and Miner is inappropriate.

## C. Intentional Infliction of Emotional Distress (Count VI)

Deitrick alleges a state-law claim of Intentional Infliction of Emotional Distress (I.I.E.D.) against Defendants Costa, Miner, Searls, and Zelinski. The Defendants argue that they are entitled to the grant of summary judgment because Deitrick has failed to offer competent medical evidence that she suffered the claimed distress.

In order to sustain a claim for intentional infliction of emotional distress ("IIED"), the plaintiff must establish that: (1) the defendant's conduct was intentional or reckless, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's conduct caused emotional distress, and (4) the resultant emotional distress was severe.[7] *Bruffett v. Warner Commc'ns, Inc.,* 692 F.2d 910, 914 (3d Cir.1982).

Existence of the alleged emotional distress must be supported by competent medical evidence. *See Kazatsky v. King David Memorial Park,* 527 A.2d 988, 995 (Pa.1987). Defendants argue that Plaintiff's claim for intentional infliction of emotional distress must fail because she has not provided competent medical evidence (i.e. doctor's report, expert report, etc.) that she has suffered distress.

---

[7] The Pennsylvania Supreme Court has yet to formally recognize a cause of action for IIED. *Taylor v. Albert Einstein Med. Ctr.,* 754 A.2d 650, 652 (Pa. 2000). However, the court has indicated that if it were to recognize such a cause of action, a plaintiff would, at minimum, need to allege the elements set forth above to prevail. *Id.*

Deitrick admits that she has not provided any expert medical confirmation of her distress, and argues that proof of her distress can be found in her deposition testimony and in exhibit F. (Doc. 225-6, since sealed and now found at Doc. 248).

The law provides that a party who asserts that a fact is genuinely disputed at the summary judgment stage must cite to specific portions of record, including depositions, affidavits, or declarations, that support its position. Fed.R.Civ.P. 56(c)(1) (A). The Third Circuit has held that this rule requires expert report to be sworn to by the expert witness. *See Fowle v. C & C Cola,* 868 F.2d 59, 67 (1989); *see also Jackson v. Egyptian Navigation Co.,* 222 F.Supp.2d 700, 709 (E.D.Pa. 2002) (excluding an unsworn expert report as incompetent evidence to be considered at the summary judgment stage); *Leo v. State Farm Mut. Ins. Co.,* 939 F.Supp. 1186, 1192 (E.D.Pa.1996) (stating that an unsworn expert's letter is "not competent to be considered on a motion for summary judgment"). Deitrick's exhibit F is clearly being offered as an expert report in support of her claim of Intentional Infliction of Emotional Distress, however, because this collection of office notes and surgical reports has not been sworn to by the expert it is not competent to be considered on a motion for summary judgment. As such, since Deitrick has not offered any competent evidence in support of her motion, it is recommended that Defendants' motion for summary judgment with respect to the state law claim of Intentional Infliction of Emotional Distress be granted.

### D. Conspiracy (Count XIII)

Deitrick alleges a state-law claim of civil conspiracy against police officers Costa, Miner, Nichols, Searls and Zelinski. Specifically, Deitrick alleges that the above named Defendants engaged in a conspiracy with her estranged husband Robert Yoncuski and others, to unlawfully detain her at a traffic stop while he and others removed a safe from her home. The Defendants argue that they are entitled to summary judgment because Deitrick fails to support her allegations with any competent evidence.

To state a cause of action for civil conspiracy under Pennsylvania law, Deitrick must plead: (1) a combination of two or more persons acting with common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damages. *Strickland v. University of Scranton,* 700 A.2d 979, 987–88 (Pa.Super. 1997). Furthermore, Deitrick must prove that the alleged conspiring parties acted with malice or the intent to injure the plaintiff. *Id.* at 988. She may not rely on mere conclusory allegations of conspiracy, but instead must make particularized allegations to describe the period of the conspiracy, the

object of the conspiracy, and the steps taken in furtherance of the conspiracy. *Grose v. Procter & Gamble Paper Prods.,* 866 A.2d 437, 441 (Pa.Super. 2005).

Plaintiff's complaint flouts all of these initial pleading requirements, and she has failed to develop evidentiary support for her amorphous claim that police officers Costa, Miner, Nichols, Searls, and Zelinski unlawfully detained her at a traffic stop in furtherance of a conspiracy to remove a safe from her home. Review of the evidence compels us to find that Plaintiff has fallen far short of the requirements that she had to meet to sustain a claim for civil conspiracy under Pennsylvania law. The record is barren of evidence to show that there was ever an agreement or meeting of the minds between Robert Yoncuski and any of the Shamokin Defendants, or that the Shamokin Defendants took overt acts in furtherance of the alleged conspiracy, or that the Shamokin Defendants had the requisite intent necessary to establish a conspiracy claim, or that the Shamokin Defendants had malice and intent to injure Deitrick. While others apparently did conspire and actually removed the safe there is no evidence except speculation that the police officers were involved. For these reasons, we will recommend that the Court grant Defendants' motion for summary judgment on Deitrick's state law civil conspiracy claim.

**E. Conversion and Trespass to Chattels (Counts XIII & XIV)**

The Defendants interpret Deitrick's complaint to allege state-law claims of conversion and trespass to chattels against Defendants Costa, Miner, Nichols, Searls, and Zelinski. However, Deitrick contends that while the complaint contains claims of conversion and trespass to chattels, these claims are not being pursued against any of the Shamokin Defendants. Since Plaintiffs are masters of their complaints, and Deitrick has indicated that she no longer seeks relief from the Shamokin Defendants, it is recommended that her claims of conversion and trespass to chattels with respect to the Shamokin Defendants be dismissed with prejudice. *See Webster v. Reproductive Health Services*, 492 U.S. 490, 492 (1989) *(citing Deakins v. Monaghan*, 484 U.S. 193, 200 (1988)).

**RECOMMENDATIONS**

For the foregoing reasons, it is recommended that the Defendants Costa, Miner, Nichols, and Zelinski are entitled to qualified immunity from Deitrick's §1983 claims of unlawful arrest and unlawful detention, and Defendants Nichols and Zelinski are entitled to qualified immunity from Deitrick's §1983 claims of excessive force. Additionally, it is recommended that that Deitrick's state-law claims of conversion and trespass to chattels against Defendants Costa, Miner, Nichols, Searls, and Zelinski be **dismissed with prejudice**, and that Defendants, request to exclude all evidence of damages regarding the theft is moot as to the Shamokin defendants.

With respect to the moving Defendants' motion it is recommended that summary judgment be **GRANTED** with respect to:

1. Deitrick's §1983 claims of unlawful arrest and unlawful detention (Count I) against Defendants Costa, Miner, Nichols, and Zelinski;

2. Deitrick's §1983 claims of excessive force (Count I) against Defendants Nichols and Zelinski;

3. Deitrick's §1983 claims of municipal liability (Counts II and III) against Defendant City of Shamokin;

4. Deitrick's state-law claims of false imprisonment and false arrest (Count IV) against Defendants Costa, Miner, Nichols, and Zelinski;

5. Deitrick's state-law claims of assault (Count V) against Defendants Costa, Miner, and Nichols;

6. Deitrick's state-law claims of battery against Defendant Nichols;

7. Deitrick's state-law claims of intentional infliction of emotional distress against Defendants Costa, Miner, Nichols, Searls, and Zelinski; and

8. Deitrick's state-law claims of civil conspiracy against Defendants Costa, Miner, Nichols, Searls, and Zelinski.

It is further recommended that Defendants' motion for summary judgment be **DENIED** with respect to:

1. Deitrick's §1983 claims of use of excessive force against Defendants Costa and Miner for the incident on August 16, 2004 at the police station; and,

2. Deitrick's state-law battery claims for the same incident against Defendants Costa and Miner.

Respectfully submitted this 17th day of July, 2013.

_**William I. Arbuckle**_
William I. Arbuckle
U.S. Magistrate Judge

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONNA DEITRICK,** | : | **CIVIL NO. 4:06-CV-1556** |
| **Plaintiff** | : | **(Judge Brann)** |
| **v.** | : | **(Magistrate Judge Arbuckle)** |
| **MARK A. COSTA, ET AL.** | : | |
| **Defendants** | : | |

## NOTICE of REPORT & RECOMMENDATION

NOTICE IS HEREBY GIVEN that the Magistrate Judge has entered the foregoing Report and Recommendation.

Any party may obtain a review of the Report and Recommendation pursuant to Local Rule 72.3, which provides:

> **Any party may object** to a magistrate judge's pro osed [sic] findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition **within fourteen (14) days after being served** with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. **The briefing requirements set forth in Local Rule 72.2 shall apply**. A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions. M.D.Pa. LR 72.3 (2010). (emphasis added).

Signed on July 18, 2013.

> *s/ William I. Arbuckle III*
> WILLIAM I. ARBUCKLE III
> UNITED STATES MAGISTRATE JUDGE